**SIGNED this 25th day of September, 2006.**

_____
**FRANK R. MONROE**
**UNITED STATES BANKRUPTCY JUDGE**
_____

```
                    UNITED STATES BANKRUPTCY COURT
                     WESTERN DISTRICT OF TEXAS
                          AUSTIN DIVISION
IN RE:                          )
                                )
RANDALL ROBERTSON               ) CASE NO. 05-10585-FM
               DEBTOR           ) (Chapter 7)
_____ )
RANDALL ROBERTSON               )
               PLAINTIFF        )
VS.                             ) ADVERSARY NO. 05-1146-FM
                                )
INTERNAL REVENUE SERVICE OF THE )
UNITED STATES OF AMERICA        )
               DEFENDANT        )
```

## MEMORANDUM OPINION

_____The Court held a trial on the merits in the above adversary

proceeding on May 23-24, 2006.  This is core proceeding under 28

U.S.C. §157(b)(2) as it is the determination of whether the Debtor

1

is a responsible person of Artec, Ltd., a Texas Limited Partnership under 26 U.S.C. §6672.  The Court has the jurisdiction to enter a final order in this matter pursuant to 28 U.S.C. §1334(a) and (b), 28 U.S.C. §157(a) and (b)(1), 28 U.S.C. §151, and the Standing Order of Reference of all bankruptcy matters from the United States District Court of the Western District of Texas.  This Memorandum Opinion shall constitute written findings of fact and conclusions of law under Bankruptcy Rule 7052.

### Facts

_____Randall Robertson, ("Debtor"), was timely assessed a penalty of $32,116.00 on July 25, 2005 pursuant to 26 U.S.C. §6672, as an alleged responsible person of Artec, Ltd., a Texas limited partnership ("Artec"), for the third quarter of 2003.  See United States Exhibit 1.

Debtor was timely assessed a penalty of $70,047.50 on July 25, 2005 pursuant to 26 U.S.C. §6672, as an alleged responsible person of Artec, Ltd. for the fourth quarter of 2003.  See United States Exhibit 2.

Artec is the successor entity of Artec, L.L.C., which was itself a successor entity of A.R.T. Associates Electrical Contractors LLC, a Texas limited liability company ("Art Electrical").  Art Electrical was founded in 1995 by Debtor and

2

Andres Marroquin and engaged in the business of electrical contracting work. Artec's general partner is Artec Management, LLC. Debtor, Andres Marroquin and Nancy Vargas are members, directors and officers in Artec Management, LLC. Debtor is a limited partner in Artec and at all times owned 33% of Artec. The general partner of Artec, Artec Management LLC, only owned 1% of Artec.

Debtor was the President of Artec's general partner. When the business started in Mercedes, Texas, the Debtor and Mr. Marroquin handled the company's business together. For example, when Jan Ross was employed as a receptionist/bookkeeper in April 2001, she interviewed both with the Debtor and Mr. Marroquin. The Debtor was represented to her to be the business manager of the company and Mr. Marroquin its technical manager as it was he who had the Master Electrician's License. Sometime shortly after Ms. Ross was employed, Artec was successful in obtaining a significant subcontract for the electrical, fire and security related work on the United States Courthouse in Laredo, Texas. The Debtor then assumed primary responsibility for that job which began sometime in April 2001. In doing so, he moved to Laredo. He then spent 90% of his time through December 2003 living during the week in the office trailer that was maintained on the job site in Laredo. He would

3

return at least two days a month to the Mercedes office and would
go home to Bastrop on the weekends.

The Debtor spent a great deal of time trying to convince the
Court that he was simply a "construction supervisor" on the Laredo
courthouse job and a couple of other small jobs in Laredo and that
he was not really involved in the internal business affairs of
Artec. However, the Debtor was more than a simple construction job
supervisor. He had the authority to sign checks and did so
routinely. He was president of the general partner of Artec and
therefore, not only had significant responsibilities with regard to
Artec's management, but was intimately aware of the overall
business affairs of Artec. He maintains, and indeed much of the
evidence placed into the record by the Debtor appears to have been
an attempt to establish, that he was not a "responsible person"
under 26 U.S.C. §6672. However, Debtor's counsel and counsel for
the Defendant stipulated prior to trial that the Debtor was a
responsible person; therefore, the analysis that the Court would
otherwise engage in with regard to that issue will not be conducted
as it serves no purpose. Suffice it to say that Debtor's
protestations with regard to his role in the company are hollow.
The Debtor had authority to hire and fire employees, and did; he
had the authority to manage employees, including those not on the

Laredo job, and did; he had the authority to direct and authorize the payment of bills, and did; he had the authority to deal with major customers and suppliers and negotiated contracts binding upon the company and did; he had the authority to authorize payment of federal tax deposits and penalties, and did as evidenced by United States Exhibit 24; and, he stipulated his position as a responsible person under 26 U.S.C. §6672. Enough said.

Additionally, the Debtor claims he conveyed his interest in Artec to Mr. Marroquin on September 25, 2003 pursuant to a sales agreement. Debtor's Exhibit P-7. The agreement however indicates that the transfer would take place after Debtor completed the jobs in Laredo or his release of services. Debtor claims he considered himself out of the company. However, Debtor continued to work at Artec and he continued to sign checks. It is apparent the agreement was never consummated.

In the year 2002, Artec defaulted in the timely payment of Section 941 withholding taxes and social security withholdings. Although the record is not completely clear, Jan Ross testified that this was a problem that occurred in at least the fourth quarter of the year 2001 or the first quarter of 2002. (Tr. p. 125-126). Marroquin, the Debtor, and Ross all went to the IRS for a meeting with regard to the delinquent taxes and negotiated a

5

repayment plan which was successfully completed. Ms. Ross testified as to two significant facts concerning this situation. First, she testified that the payment of these taxes over time added to the cash flow problems the company later experienced; and, secondly, and perhaps more importantly, that the Debtor, prior to meeting with the IRS, told her not to worry about the taxes – to first pay everything else, i.e. vendors, payroll, etc. and to catch up on the taxes later.

The Debtor's testimony on that point was not that different. The Debtor said he did not tell Ms. Ross not to pay the taxes but that he told her that she had to pay the vendors and employees first. Otherwise, there would be no money coming in with which to pay the delinquent taxes at a later time. The testimony of the two witnesses in this regard reflect a distinction without a difference.

Ms. Ross also testified that sometime in July of 2003, she became concerned over Artec's cash flow problems and told Marroquin Artec had insufficient cash to continue to make full payment to their employees and their vendors as well as make the required monthly 941 tax deposits. This evidence is corroborated by the fact that in the same time frame – June, July 2003 – checks began bouncing on a monthly basis. She said she stressed to Marroquin at

6

that time the importance of making the 941 tax deposits.

It is obvious that the Debtor knew this as well. The payees, either vendors or employees, in Laredo who received NSF checks would call the Debtor seeking replacement checks.  Both Ms. Ross and the Debtor testified to this.  And, Ms. Ross was very clear in her testimony that she talked not only to Mr. Marroquin but also to the Debtor about the urgency of paying the withholding taxes on a timely basis.  She also identified the context within which such conversation took place.  She stated that in late July or early August 2003 the Debtor called her asking about the insufficient funds checks that certain vendors and employees were experiencing in the Laredo area.  Her explanation to him was simple.  It was that there was simply not enough money and that Artec could not fully pay the obligations it was incurring to vendors, the employees, and the IRS for 941 tax deposits.

Based upon Artec's previous problems in not paying and/or late paying 941 withholding taxes, the Debtor's position of authority within Artec, and the surfacing cash flow problems as evidenced by the NSF checks during the summer of 2003, of which the Debtor was well aware, there is no reason not to believe the testimony of Ms. Ross on this point.

7

Ms. Ross testifies to an additional conversation in late October or early November with the Debtor concerning the same subject matter. This was at about the same time that Ms. Ross prepared the 941 withholding report for the third quarter of 2003 filing, had Mr. Marroquin sign it, and wrote across the top, "Mailed 10-31-03 Did not send money".

Debtor maintains he did not know of the nonpayment of these payroll withholding taxes and social security withholdings until December 23, 2003. This is not only rebutted by Ms. Ross' testimony but also by the testimony of Mr. Marroquin as well. Marroquin testified that he had a conversation with the Debtor the first week of November 2003 on this exact problem after he learned from Ms. Ross that they were not going to be able to pay the third quarter withholding taxes. However, Mr. Marroquin most likely learned that a lot earlier since he was always in the same office with Ms. Ross and on October 18, 2003 he had signed the Form 941 report for the third quarter 2003 referenced above. Obviously, Marroquin knew as early as October 18, 2003 that the 3rd quarter 941 taxes were not going to be paid; and that the 4th quarter would likely not be different. And, chances are he knew even earlier than that. In any event, Marroquin's testimony that he had a telephone conversation with Debtor the first week of November and

8

a personal visit the second week of November on this exact subject seems entirely credible.

Debtor attempts to buttress his allegation that he only became aware of the nonpayment of third and fourth quarter taxes on December 23, 2003 by pointing to copies of seven payroll checks he signed on that date, one of which was to himself and all of which ended up bouncing. The Court is unsure of the connection between these checks and the timing of the Debtor's knowledge of the nonpayment of taxes. In any event, the Court does not believe the Debtor's testimony that he only learned of the default on December 23, 2003. All of the other testimony and evidence shows that he learned that there was a problem with paying the 941 monthly tax deposits as early as late July and/or early August 2003 and that he knew the third quarter taxes were not going to be paid as early as the first of November 2003. Likewise, he then also knew the money shortage problems were not going to get better in the 4th quarter.

The question also arose at trial as to whether Artec had any unencumbered funds during this time period with which to pay taxes. Both Mr. Marroquin and the Debtor testified that the bank controlled the flow of funds from May/June 2003 through the end of the year. They also testified that the bank had a security interest on all of the accounts receivable of Artec and that most

checks submitted to the Debtor by the entities for whom they were doing work came in as joint payee checks.  They were jointly payable either to Artec and a specific vendor or they were jointly payable to Artec and its bank.  However, Marroquin testified that he and the Debtor would decide how the funds deposited in the bank account were disbursed.  But, Mr. Marroquin also testified that Artec could not pay the IRS because he had no control of funds. His testimony on this point conflicted.  Surprisingly, no one introduced any loan documents supporting this testimony. No one from the bank testified.  No one introduced any type of documentary or written evidence reflecting a restriction by the bank upon Artec's use of funds.  We are simply left with the testimony of Mr. Marroquin and the Debtor that the bank would not let them pay the IRS from May/June 2003 on. However, second quarter taxes were paid–presumably when due in July 2003.

Further, Mr. Marroquin's trial testimony is not consistent with his interview statement made to the Internal Revenue Service on October 10, 2004. He makes the following written statement on this issue.

"In November, December 2003 + January 2004 I tried to pay taxes but our Banker told me & Jan not to pay taxes.  Instead he wanted payment on note.  From 11/2003 to 1/2004 company had no control over money deposited.  I tried to get Randall to come to Mercedes office but he would not.  Knowing the company

10

was going down.  Brent without me asking put $155,000.00 into the account and he still would not let me pay taxes.  At that point he told me not to worry about Randall, for me to pay the bank notes and pay the taxes slowly.  He would take care of Randall at that point.  I decided to call it quits."

United States Exhibit 15.

The more believable evidence on this issue is Mr. Marroquin's written statement to the IRS.  The Court finds that the bank's control of funds did not begin until sometime in November 2003, well after the third quarter had ended and well into the fourth quarter 2003.  Mr. Marroquin's statement to the IRS is additionally enlightening because it establishes that in early November 2003 both he and the Debtor were not only aware of Artec's cash flow problem, they were also aware that the "company was going down".

If, in fact, the bank did assert such authority over its collateral in November 2003, then from that point on Artec would have had no "unencumbered" funds with which to pay the taxes.  The record is, however, silent with regard to the day in November this occurred or the amount of withholdings after such date.

## **Issue**

_____Did the Debtor act wilfully in failing to pay over trust fund taxes within the meaning of 28 U.S.C. §6672?

## Conclusions of Law

Liability attaches to a "responsible person" under 28 U.S.C.

§6672 upon his or her "wilful" failure to collect or account for or

pay over such funds.  In pertinent part §6672(a) provides that:

> Any person required to collect, truthfully account for,
> and pay over any tax imposed by this title who wilfully
> fails to collect such tax, or truthfully account for and
> pay over such tax, or wilfully attempt in any manner to
> evade or defeat such tax or the payment thereof, shall in
> addition to other penalties provided by law, be liable to
> a penalty equal to the total amount of the tax evaded, or
> not collected, or not accounted for and paid over.

26 U.S.C. §6672(a).

The Fifth Circuit Court of Appeals has substantial precedent

on these issues.

> Wilfulness under §6672 requires only a voluntary,
> conscious, and intentional act, not a bad motive or evil
> intent.  Wilfulness is normally proved by evidence that
> the responsible person paid other creditors with
> knowledge that withholding taxes were due at the time to
> the United States.  A considered decision not to fulfill
> one's obligation to pay the taxes owed, evidenced by
> payments made to other creditors and the knowledge that
> the taxes are due, is all that is required to establish
> wilfulness. (Citations omitted).

*Barnett v. Internal Revenue Service,* 988 F.2d 1449, 1457 (5th Cir.
1993), reh denied 1995 F.2d 225 (5th Cir. 1993).

Wilfulness means:

> (a) Voluntary, conscious and intentional act such as the
> payment of other creditors in preference to the United
> States ... A responsible person also acts wilfully if he
> proceeds with a reckless disregard of a known or obvious

risk that trust funds may not be remitted to the government.

*Brown v. United States of America,* 591 F.2d 1136, 1140 (5th Cir. 1999), citing *Lidden v. United States,* 448 F.2d 509, 513 (5th Cir. 1971), cert. denied 406 U.S. 918 (1992).  See also, *Mazo v. United States,* 591 F.2d 1151, 1154 (5th Cir. 1979), cert. denied 444 U.S. 842 (1979).

Reckless disregard includes the failure to investigate or to correct mismanagement after being notified the taxes were due. *Mazo v. United States,* 591 F.2d at 1154.  Negligence is not enough to satisfy the wilfulness standard under the statute.  *Feist v. United States,* 221 Ct. Cl. 531, 607 F.2d 941, 961 (1979).

Absence of wilfulness can be proven by the Debtor showing that he did not disregard his duties and that he undertook all reasonable efforts to see that such taxes would, in fact, be paid in circumstances where the employer had the means of payment and could reasonably expect to make the payments.  *Feist,* 607 F.2d at 961.

At the conclusion of the taking of the evidence, counsel for the Defendant made a statement which, in essence, was an oral motion for the Court to disregard any evidence that Artec suffered from a lack of "unencumbered" funds during any relevant point in time because it had not been pled by the Debtor.  Defendant's theory is that the issue of "unencumbered" funds is like an

13

affirmative defense which must be pled or evidence on it cannot be considered.

There are two things wrong with the Defendant's assertion. First, it is clear that the burden of proving that he did not act wilfully is clearly upon the Debtor. *Bowen v. United States,* 836 F.2d 965, 968 (5th Cir. 1988): *Mazo,* 591 F.2d 1151, 1152-53 (5th Cir. 1979). Secondly, it is equally clear that the issue of "unencumbered" funds is part of the wilfulness inquiry. The Fifth Circuit has stated the following:

> We initially note the operative definition of 'encumbered,' which we adopt from the Eighth Circuit's §6672 jurisprudence. In *Honey v. United States,* 963 F.2d 1083 (8th Cir. 1992), the court stated:
>
> '[w]here the taxpayer's discretion in the use of funds is subject to restrictions imposed by a creditor holding a security interest in the funds which is superior to any interest claimed by the IRS, the funds are regarded as encumbered if those restrictions preclude a taxpayer from using the funds to pay the trust fund taxes.'

*Barnett,* 988 F.2d at 1458.

At the beginning of the trial the parties stipulated that wilfulness was the issue that would be tried. Therefore, since funds must be "unencumbered" for them to be wilfully used for a purpose other than paying the Internal Revenue Service for 941 taxes, it is clearly proper for evidence on that point to be considered. And, as such, both the Debtor and Defendant explicitly

14

agreed to the trial of that issue.  Stated another way, the Debtor, in order to prove that the funds of Artec were "encumbered" and that his failure to pay over to the IRS was not wilful, has the burden to prove that "he lacked discretion to use the accounts receivable and loan proceeds deposited...to pay the accrued withholding taxes." *Id*.

So, did the Debtor sustain his burden on this point?  The answer can only be "No".  He introduced no loan documents.  No one from the bank testified and no one introduced any type of documentary or written evidence reflecting a restriction by the bank upon Artec's use of funds.  We do have the testimony of Mr. Marroquin and the Debtor that the bank would not let them pay the IRS from May/June 2003 forward.  However, Mr. Marroquin's written statement to the IRS is more credible and 2nd quarter taxes were paid in July.  The bank's alleged control of the funds began, at the earliest, sometime in November 2003, and the Debtor failed to provide any evidence as to the specific date.  The evidence simply falls short of what is required.

Debtor also claims his action cannot be wilful because he was in Laredo performing his "job superintendent" duties and believed himself to be a rung below Mr. Marroquin who he claims held the checkbooks and purse strings and had a psychological advantage over

15

the Debtor.  Debtor asserts that 1) he functioned primarily like an employee, not an owner or president; 2) Mr. Marroquin dealt with Artec's banker, attorney and accountant; and 3) Mr. Marroquin and Ms. Ross handled payroll and paying suppliers and sent checks already prepared to the Debtor to execute to pay his Laredo workers and  blank checks on a request-only basis to him for overlooked employee checks and supply purchases.  Debtor testified that he believed the parties in the Mercedes office were taking care of the taxes and he was taking care of his jobs in Laredo as superintendent.  However, the Debtor has stipulated he is a responsible party.  And, the evidence shows he had a much greater knowledge of and participation in the affairs of Artec than he is willing to admit.

Additionally, Debtor argues that the sales agreement between he and Mr. Marroquin resulted in his being solely an employee and he *de facto* resigned which relieved him of any other corporate duties and responsibilities. Debtor claims he believed he could not write checks or direct funds except as approved by Mr. Marroquin. By the time the Debtor learned of the tax defaults, he claims it was too late to do anything as no available Artec assets remained to pay the taxes.

Debtor attempts to argue that his failure to pay the tax is

16

not wilful because it is based on "reasonable cause".  The Fifth Cirucit does recognize this exception but it is a 'very limited application". *Newsome v. United States,* 431 F.2d 742, 746-747 & n. 11 (5th Cir. 1970)(Party's attempted reliance on accountant's information did not constitute a 'reasonable cause' for party's failure to pay the withheld taxes-party knew taxes were not being paid while other creditors received payments).  The Fifth Circuit has determined that where a responsible officer paid employees their net wages at a time when the corporation had insufficient funds to cover the taxes thereon and when such funds became available, preferred subsequent creditors over the IRS, knowing at all times his obligation to pay such taxes, his failure to pay was 'without reasonable cause' and 'wilful' within the meaning of §6672.  *Frazier v. United States,* 304 F.2d 528, 530 (5th Cir. 1962).

Debtor believes he had reasonable cause not to pay the taxes because he alleges he only discovered that the taxes were not paid on December 23 or 24th, 2003, he resigned from the corporation shortly thereafter and he had no ability, or perceived ability, to control and/or transfer funds of Artec or control or access those funds without the cooperation of Mr. Marroquin and Ms. Ross which cooperation he alleges did not exist.

17

The Debtor attempts to place emphasis on the controlling role of Mr. Marroquin and Ms. Ross in the financial affairs of Artec. However, §6672 does not confine liability for the unpaid taxes only to the single officer with the greatest or closest control or authority over corporate affairs.  "Realistically read, [§6671(b)] encompasses all those who are so connected with a corporation as to have the responsibility and authority to avoid the default which constitutes a violation of [§6672], even though liability may thus be imposed on more than one person.' *Scott v. United States,* 354 F.2d 292, 296  173 Ct.Cl. 650 at 657 (1965); And see also, *McCarty v. United States,* 437 F.2d 961, 967, 194 Ct. Cl. 42, 54-55(1971); *White v. United States,* 372 F.2d 513, 517, 178 Ct. Cl. 765, 771 (1967); and *Monday v. United States,* 421 F.2d 1210, 1214 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed. 2d 48 (1970),

Mere delegation of responsibility to another is not 'reasonable cause'. *Lawrence v. United States,* 299 F.Supp. 187, 191 (N.D. Tex. 1969).  And, neither can lack of control of corporate funds or perceived inability to control and/or transfer funds be 'reasonable cause' especially in this case as the Debtor knew 1) that the taxes were not being withheld and such funds were being paid to other creditors as early as November 2003 and 2) that Artec did not have enough money to pay vendors, employees and taxes

18

as early as July, 2003.

The evidence presented to the Court makes it clear that the Debtor acted wilfully.  The Debtor himself testified that he signed checks to other creditors after learning of Artec's failure to pay the 941 taxes (Tr. 66).  Either in July or August 2003, the Debtor knew there was a serious cash problem.  He also knew that the third quarter taxes were not paid in early November 2003 and that the business was "going down". The Debtor knew that the withheld moneys were trust funds for the United States and must be paid to it. He had been involved with a prior failure to pay such funds and even met with the IRS to negotiate a workout agreement.  He knew that Mr. Marroquin and Ms. Ross who normally paid the taxes had not done so.  The Debtor failed to show he tried to do anything to see that Artec paid the withholdings to the IRS.  His defense is that of an ostrich.  He stuck his head in the sand. That is not a defense recognized at law.  His failure to perform his duty is, as a matter of law, a voluntary, conscious and intentional failure.

In the alternative wilfulness can be proved by showing that the responsible person recklessly disregarded his duty to collect, account for and pay over the trust fund taxes or by showing that the responsible person ignored an obvious and known risk that the trust funds might not be remitted.  *Brown v. United States,* 591

19

F.2d 1136 (5th Cir. 1979).  Here, the Debtor made no efforts to see that such taxes would in fact be paid.  He failed to investigate or to correct mismanagement after being notified that withholding taxes had not been remitted.  He merely stuck his head in the sand and hoped Mr. Marroquin and Ms. Ross would find a way to pay such.

Given the continuing cash flow problems of Artec of which he was aware in July 2003, his position of responsibility within Artec, and the past 941 tax defaults, the Court finds that the Debtor acted with reckless disregard in line with the standard set forth in *Brown v. United States*.  The Debtor knew a substantial risk existed that the 941 taxes would not be paid for the third quarter 2003, and he made no attempt to address the problem.  Artec had suffered from a similar nonpayment incident in 2002. The Debtor at that time directed other creditors be paid before the IRS.  The Debtor acted in a similar manner the second time by ignoring Artec's financial problems.  Despite his protestations to the contrary, the Debtor exercised substantial control within Artec, and was clearly in a position to insure that the 941 taxes were being paid.  The Debtor was fully aware of Artec's financial problems from July 2003 on and the potential impact it would have on payment of 941 withholdings.  The record as a whole makes it clear that he acted wilfully in failing to pay over the trust fund

20

taxes within the meaning of 28 U.S.C. §6672.

Conclusion

The Debtor is a responsible person of Artec who acted wilfully under 28 U.S.C. §6672.  The assessments on July 25, 2005 of $32,116.00 and $70,047.50 for the third and fourth quarter 2003 941 taxes are non-dischargeable under 11 U.S.C. §523(a)(1) and 11 U.S.C. §507(a)(8).

###